Summary judgment was granted on Appellant's Equal Protection Claim, even though this is the rare case in which the record contains direct evidence of racial animus. At the hearing, my client Mr. Serrano said, I would not think of hitting a white officer. Do you think I would do something so stupid, especially while I'm in a wheelchair? Francis's response, I don't know how black people think, and I'll never know. This racially charged comment created a genuine issue of material fact as to whether Francis's denial of Serrano's right to call eyewitness testimony, and separately, Francis's decision to sort of out of hand reject that testimony, the statements that were presented to him. Even though that was introduced by the appellant himself? Well, it was introduced by the appellant in the form of the investigating employee's report. In that respect, he submitted as part of the declaration. I'm talking about the excerpt you just recited to us. That was introduced by the appellant himself. Exactly. And there is no contrary evidence. I just wanted to get that straight. Yes. But he introduced race first. He said, why would I hit a white officer instead of saying why would I hit an officer? Why wasn't that introducing race into the equation initially? The concern isn't whether you introduce race as a topic. I think the issue from a hearing officer's perspective is whether or not the hearing officer is basing his decision on racial animus. So if Serrano's explaining that, Serrano's explanation of why the officer has a reference to racial tensions in prisons and perhaps a reference to how unlikely it would be that, in his judgment, a black inmate in a wheelchair would attack a white officer. If Francis simply took that as evidence and did with it what he might, then we wouldn't have an issue. But for Lieutenant Francis, the hearing officer, to respond in a way that impugns the potential that there is some underlying reason that deserves some validity, that's the concern. So what are we to do with Lieutenant Francis's comment that I'm not going to let you call your crip buddies? That seems to me to suggest that the lieutenant had a concern with regard to institutional security. We are very familiar with the problems of prison gangs. And the needs of the institution to maintain security and discipline while they're conducting hearings which are not full-blown criminal or civil trials. Well, what's interesting is that the record is ambiguous as to what the word crip meant. Well, we know what it means, don't we? Well, or I infer that it meant cripple buddies because he was in a wheelchair handicapped related unit and wheeling in... You're suggesting that crip meant cripple? Correct, because it's wheelchair-bound people, so the wheel... Are you suggesting that that's a compellable inference or just a permissible inference? Well, I think it's an inference that appellant is entitled to on summary judgment, considering that that's the only evidence in the record. Is the word crip or crips? It was crip. And that's one issue, for example, that one might want to see in Francis' declaration. One might want to have the court address that issue. And it's another ambiguous issue left in the record. The key ambiguous issue left in the record is how you take four eyewitness statements that are consistent with what Serrano said, and you simply dismiss it out of the hand. You don't explain in the record why you find they're not valid. And here are the kinds of things that... And he did review those statements, did he not? Well, we know that he saw the statements. Those were the written statements that had been prepared by the prison investigator who was assigned to assist your client in preparation of his defense? Partially accurate. That prison investigator was assigned to help Lieutenant Francis... Gather the facts. Gather the facts. And it's important to emphasize that at this time, my client, Mr. Serrano, was in segregation, had no opportunity to do his own fact-finding or to talk with the other people, which, incidentally, is something on its face that one would wonder. An investigating officer comes in to interview these people, and the sum of what they had to communicate was basically two sentences in most cases? Interestingly enough, none of those statements say whether or not, explicitly, whether or not any punches were thrown and by whom. Wouldn't that be the sort of thing you'd want an eyewitness to come in and at least ask them about? Wouldn't you want to maybe test their affiliation with Serrano? Do they like him? Do they not like him? We have evidence in the record that two inmates prevented Serrano from moving, which is one of the reasons he was late to get to the cell. Let us assume that it was a constitutional error on the part of the hearing officer not to produce the witnesses. Where do you go from there from the standpoint, let's say, of qualified immunity? Well, on the standpoint of qualified immunity, I think the answer is fairly simple, and that is that all we, all Serrano needs to prove to avoid summary judgment and to get to trial is that there are genuine issues of disputed fact here. Even if the officer has qualified immunity? Well, qualified immunity, there's two ways. If the record is sufficient to show that the officer has qualified immunity, and that's one thing at this stage, it doesn't exist here. In which case, if... Why doesn't it exist if there's a prison regulation on which the officer could rely that permits him to conduct a hearing without calling live witnesses, simply reviewing the investigative reports and listening to the testimony of, I guess it was Officer Jones? Correct. And your client, Mr. Serrano. Right. The reason is that Serrano's claim is that the officer did not actually follow that prison regulation, but instead exercised what appeared to be discretion. He actually was motivated by racial animus. Counsel, doesn't the regulation require the hearing officer to state why the witnesses were not called if they aren't called? Absolutely. And that never occurred. Only belatedly after the fact, in this conclusory declaration, did Lieutenant Francis say simply that he found that they were not relevant and that it was an oversight. Nowhere do we have an explanation of why they weren't relevant. Nowhere do we have any sort of explanation about that. We don't have to decide that today. The important issue... Let's... I think there's some very important issues that you haven't approached yet. Because let us assume that that was a violation of due process. OK? In the analysis of qualified immunity, we then have to determine whether there was... Well, not only from the standpoint of qualified immunity, but in the context of a settled environment, like a prison, in order to have a procedure of violation, you have to show that the substantive offense, which later is putting him in the hole without his wheelchair and without facilities to get along in that segregated situation, as far as segregated from the rest of the prison community, whether it was imposed in a typical and significant hardship on the inmate in relation to the ordinary incidents of prison life. Let me answer that. That situation is... The question is, was that a constitutional deprivation, OK, to if it was a constitutional deprivation, was it a constitutional deprivation that was known and established prior to, let's say, prior to this case? OK. I have about a minute left and likely... We'll give you a little extra time since we've asked you a lot of questions. OK. Thank you, Your Honor. OK. The first answer to your question is that there are two different claims here. One is due process and one is equal protection. The due process... That's what we're talking about now. OK. But I would emphasize, before we jump to the process, that the equal protection claim stands on its own, and if Francis is... There's no question about that. OK. Fine. You're running through open windows on that one. All right. So, in terms of the due process claim, it's Serrano's statement, the inquiry about whether there's an atypical and significant hardship is on an individual case-by-case, fact-specific basis. So you look at Serrano, the disabled prisoner who had to crawl around in a cell because his assistive devices were not allowed... We know that, sir. The question is, has there been any recorded decision saying that that was a constitutional deprivation for a prison to submit a person who is handicapped to an isolated cell that does not have holders above what he wants to get on, the commode, ladders, or some facility to get into his bunk, the substitute, for example, for a wheelchair? OK. Do you have any cases on that? Well, this is what I have for you. I have Ramirez v. Galazza, which is a Ninth Circuit case that was decided at the end of June 2003, not in the papers because it was issued after we briefed it. That's 334 Federal 32nd 850. That case found that the person was entitled to go back and plead sufficient facts to be able to make a claim for a potential atypical and significant hardship. And that's the only issue here, is whether or not he can go back and possibly could allege something in his complaint for a due process that might establish that atypical and significant hardship. Was there a summary judgment, though? No. Not on the first claim, the due process claim. On the due process that was dismissed? Without need to amend at the pleading stage. And Ramirez makes it clear that not only should he have been given a chance to do it again, but that the atypical and significant hardship decision is a case-by-case determination. So this Court could also look to the Armstrong line of cases before this Court dealing with the conditions of And the Court's decision in those cases was that the prison was acting inappropriately and people were in bad conditions. Now, you don't have to rise to an ADA violation. You don't have to rise to an amendment violation. All you have to show is atypical and significant hardship. And we don't have to prove it to you on this record today. The only question is whether, is it possible that Mr. Serrano could create a complaint that was to satisfy atypical and significant hardship standard? And if so, he gets another chance. Okay. Thank you. Anything further? Thank you very much, counsel. We'll hear from Mr. Bazon. Good morning, and please support. My name is John Bazon. I'm the Deputy Attorney General for the State of California, representing Appellee Defendant Lieutenant Francis. Addressing due process first, the appellee did bring cases regarding due process. There was citation to Wyckoff v. Nichols, Morsett v. Peters, and Young v. Hoffman. In those cases, similar to this situation, there was a disciplinary hearing. There was the individual who was having their disciplinary hearing was put in that SEG. There was an error. Subsequently, it was corrected, and those courts found that there was no due process violation because it was corrected. But, counsel, this goes a little beyond that. I think plaintiff in this case is talking about the circumstances of the hearing, but the aftermath of the hearing. And on a pleading, we're at a motion to dismiss, so why isn't it appropriate to let him go back and replead this if the court thought there was not sufficient statement of a cause of action? Well, those cases were very similar to this, and in those cases, the first issue, was there a due process violation? And they found there was none. So it's going to the damage first before finding a due process. Those cases, they looked at is there a due process violation, and they found that, as is here, when the alleged due process violation occurred and is corrected, there is no due process violation. So it's your view that if, in fact, there was an atypical hardship visited upon this plaintiff in light of the fact that he was put into a cell where his wheelchair could not be accessible to him, and he had to crawl across a roach-infested floor, that there is no remedy for that? Your Honor, those are deplorable conditions that were stated. But there's no causation with regards to Lieutenant Francis. If the court were to look at the... I have an Eighth Amendment, I'm not sure who, or habeas corpus. I think the proper way for him to have moved was to immediately brought a habeas corpus because of the conditions of confinement. But he can't get damages under habeas corpus. Why doesn't he state a civil rights cause of action if he can prove those allegations? He may, Your Honor, but not against Lieutenant Francis. Why not? If Lieutenant Francis's action precipitated the conditions under which he labored, why wouldn't he be able to get damages against Lieutenant Francis? Under this, I think it's, well, this Court's holding in Lear v. Murphy to discuss this causation, and it would have to be a Lieutenant Francis's duty for... Duty to do what? It would either have to, you would have to look at the duties and responsibilities of Lieutenant Francis. If it was not his duty or responsibility to put Serrano in the SHU, then he cannot be held for the conditions in the SHU. If we take a typical causation analysis, would you want to do but for a proximate cause? But for, it would not be Lieutenant Francis. But for Lieutenant Francis, making the ruling that he did, the plaintiff would not have been in SHU. Proximate cause, reasonably foreseeable that he would go to SHU with the outcome that the Lieutenant did. So why is he not a cause? Your Honor, if I would direct the Court to page 33 of Appellant Supplemental Excerpts of Record. In that page, it indicates that offense refers to the BPT for SHU consideration. Lieutenant Francis didn't have Serrano put in the SHU, nor did his ruling necessarily put Serrano in the SHU as indicated by this document. Is that his finding of what is the Category B violation for assaulting a staff member, once he makes that factual determination that the inmate is guilty of that offense, which he knows is punishable by up to, what is it, a year in the Special Housing Unit? In this particular case, I think he got 150 days. Okay, but it can be up to a year, right? I believe so. Okay, and you're suggesting that because it is another institutional officer who actually imposes the punishment, that that's not a proximate cause? He was only referred for consideration for SHU. Let me ask the question a different way. If Lieutenant Francis had determined that no violation had been committed, then he wouldn't have gone to SHU, would he? That would be correct. So why isn't that proximate cause? Because he didn't, merely by his ruling that there was a battery on an officer, did not place Serrano in the SHU. But I believe that the court, in the three cases that I cited to, I mean, that's like saying that the jury's not responsible for the punishment that the judge imposes after the jury finds the defendant guilty. That's a very odd view of the law. No, Your Honor. In reading that CDC 115A, he's saying he's referring him to another body. So it wouldn't be a situation of punishment based upon the factual determination that he's guilty of the offense. I would say, though, Your Honor, that looking at the three cases I cited to, it's kind of putting the cart before the horse to look at the conditions in the SHU, because based on the cases I cited to you where there was an ad sec situation, those courts found that there was no due process violation. If there's no due process violation, then the conditions in the SHU are immaterial. Well, counsel, I'm just expressing my own view of this, which is obvious from the questions I put to your friend. I think it was a constitutional violation from the standpoint of procedural due process for not permitting him to call witnesses. I also say that that procedural due process cannot go into effect until there is proof of conduct that's atypical, to use the Breck or the Sullivan formula. I think that your strongest point is qualified immunity. Even though the district court did not decide it, we can affirm the district court for other reasons. Your best bet is that at the time of this incident, there was no established case showing that where an inmate is in a wheelchair, that is a constitutional deprivation to put him into restricted housing unless that housing has facilities equivalent to a wheelchair. I think that was your last argument, and I think that's your strongest argument. Your Honor, under the Saucier test as well, going to the second prong of that test on clearly established and, of course, the court in that ruling in Saucier said that the inquiry is whether the right is clearly established, as whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted. Counsel, I'm not sure that the case law has to say specifically that it's a wheelchair-bound person who is put into a cell without his wheelchair. Doesn't our case law say that if the general proposition has been established, that's sufficient to be clearly established for purposes of qualified immunity? I believe that looking at the second prong, it would be a situation where the facts in front of Lieutenant Francis would he know that his conduct would be unlawful. And I believe looking at both equal protection and due process, that he would not know. So is your position that a reasonable correction officer would not know that putting an inmate into a cell without his wheelchair, where he had to crawl across the floor to get to the restroom, a reasonable officer would not know that that's an atypical environment for an inmate? There's no evidence in the record that I'm aware of that Lieutenant Francis had any idea of the conditions in the cell. Reasonable. This is objective at this point. We're not talking about subjectively what Lieutenant Francis knew, but would a reasonable correctional official know that? Assuming that Lieutenant Francis was aware of the conditions. We're not talking about Lieutenant Francis. We're talking about objectively. Under saucier, we're talking about a reasonable officer. Under the conditions that were described by Serrano, the appellant? The conditions that existed in this case. Would a reasonable correctional officer know that that violates the Eighth Amendment? I believe that if a reasonable officer, if those were the conditions and he was aware of them, that if he and he was responsible for putting him in that issue, that there could be liability on an officer in that situation. Well, why? Is this hearing officer responsible for setting conditions in the jail or is that the warden? Or is it if not the warden, is it the state correctional institution? It would not be the hearing officer, Your Honor. Why didn't you respond to Judge Rawlinson and say, look, this is a hearing officer. The conditions and the procedures and the regulations are not set by a hearing officer. And the other people weren't sued in this case. Yes, Your Honor. And that's why I brought up causation earlier on. Summing up, going to equal protection, there was a declaration that was part of the moving papers by Lieutenant Francis, in that he does in fact explain that he was basing his decision on state law, that when you read, if you were to look at the CDC 115A, these people's testimony was duplicative. All four of them say the same thing that Serrano said. He didn't say that when he explained why he didn't call witnesses. He didn't explain that it was duplicative, did he? He did not, Your Honor. And he did explain that in the declaration, that it was an oversight. It's a form. A CDC 115A is a form. You check the boxes. And I would also say that the Court, looking at the CDC 115A, you can see that he was not arbitrary in the situation, but there was a mistake made. He didn't check a box. But those statements are there. They're all duplicative. They're all identical. They all say the same thing, that the reporting officer, Jones, picked Serrano up by his shirt and the wheelchair fell over. There's also a corroborating statement in the fact that when you look at the CDC 115, there's bruising. So it isn't just the statement of Officer Jones against Serrano and his four witnesses. There's bruising that's consistent with what he said. Is it my pronouncing your name, Bazan? Yes, Your Honor, Bazan. Bazan. Obviously, we're concerned about the condition of the sacred cockroaches and so forth. Going off the record now, what is the procedure that the correction institutions are doing for persons similarly situated like this? I can understand why you would not permit a person's wheelchair to be brought in, because they would be creating weapons and so forth. But off the record, has the Department of Corrections established some possible, some procedure for situations where prisoners in wheelchairs or, say, with crutches and so forth, may not have special treatment when they are taken out of the general prison population? Yes, Your Honor. Your Honor, there's a number of injunctions that there's overwatch groups that go to prison to prison and check the conditions. And this one. Okay. Thank you, Counsel. Your Honor, if I can say one last thing. One last thing. Going to Serrano's declaration, and it was noted, and I'm not trying to condone the statements that are being alleged, but it was initiated by Serrano. And the very last thing that's said when Serrano says that it was unconstitutional, Lieutenant Francis tells him, I'm treating you like all the rest. What does that mean? When I read it, Your Honor, I mean he's treating them just like all the other inmates. But you have to have more than one meaning, though, as well. Yes, Your Honor. But I don't believe, I believe that's the reasonable inference when someone says all the rest. All right. Thank you very much, Counsel. Thank you. I see I have failed in my efforts to maintain any kind of discipline on time. But out of fairness to you, I'm going to give you another minute in rebuttal. We asked a lot of questions. Let me address what I hope are the two main issues, or at least two of the most large ones. Judge Aldersert, you focused on the idea that why is it fair to punish Lieutenant Francis for the conditions in the housing unit. And I think the distinction here is that he's not being punished for the conditions in the housing unit. The fact that the conditions were atypical and significant hardships are what triggered the due process violations, the due process obligations. He's being punished only for violating due process rights, or at least he'll be punished to the extent. For procedural due process. Yes. And I might, if I could, and I'd lay out the argument for you. I think we all understand that. Sure. The, he's an obligation. Before that kicks in, though, you have to move to the other incident. You have to establish atypical and significant hardship rights to get the procedural due process right. So, but I guess the point is that the punishment is not for the conditions in solitary confinement. The punishment is for failing to follow Supreme Court precedent in Superintendent E. Hill, that there has to be some evidence supporting the finding of the hearing. And case law has gone through this and indicating that if the analysis is arbitrary, if it's patently deficient, if it doesn't have some strong initial reliability, then it establishes a due process claim. But counsel, what about opposing counsel's argument, excuse me, that once the due process violation was corrected, the cause of action no longer exists? Well, that applies to, if the due process claim was triggered on the loss of the time credits, for example, then that would be the case. But the due process claim is not premised on that. The due process claim is premised on something that cannot be corrected. And what cannot be corrected is the time you spent in a segregation unit facing atypical and significant hardship. That's the key point. I think we understand that. Okay. And I would like to point the court out to Hines v. Gomez, a Ninth Circuit case that, sorry, Zavarro, point the court out to Zavarro v. Coughlin, a Second Circuit case, that specifically rejects qualified immunity in the procedural due process grounds similar to this. The last thing I would, I realize I'm abusing your considerations in terms of time. I don't want to get into the edge of the envelope. Okay. I'll make it fast. I would say. I think you've closed with a bang now. If you talk some more, it'll be okay. Your Honor, based on your experience, I'm going to take your word for that. Don't snatch the defeat. Thank you. Counsel, I do want to thank you for taking this case pro bono. The court very much appreciates all lawyers who take on these cases, and I want to thank you both for your argument. The case just argued is submitted. We'll get you an answer as soon as we can. The case of United States v. Haswood is ordered stricken from the calendar. We'll hear argument in United States versus Sandoval Gonzalez. Good morning. Vince Bronto, Federal Defenders, on behalf of Mr. Sandoval Gonzalez. Unless there are any questions from the bench, I intend to devote my time to the jury instruction issue in this case, and that is Mr. Sandoval Gonzalez's conviction must be reversed because the district court made two critical mistakes. First, the district court failed to instruct on derivative citizenship before the case was submitted to the jury, and then during jury deliberations upon a request from the jury, the district court erred by failing to allow additional argument once those derivative citizenship instructions were issued. As an initial matter, the derivatives. Just so that we understand the context. The defendant. Wait a minute. Yes, it was a defendant. Right. Major request for jury instructions. Right. Correct. They were not given. Correct. But after the jury was deliberated, they were given. Correct. OK. Well, as they were deliberating, they asked for a question. Yes. Yes. Yes. All right. They were doing. And so the the gravamen of your complaint is that counsel did not have an opportunity to argue that. Correct. OK. And that's your main issue. That is the main issue. I'm sorry. Wasn't that wasn't that argument made before the jury retired to deliberate? It might not have been made in the context of having those instructions given. But the derivative citizenship argument was made by counsel. Actually, I disagree. Some facts were argued. And in the abstract, it may have been argued, meaning our theory is that the government didn't prove that he was a citizen. The key problem is of this is defense. Counsel had no law to back up his factual argument. There is no uniting the facts of the case. So the law of the case instruction was given. So we now have a marriage of counsel's argument and the law. No. Would you have argued differently than what was argued to the jury before that clarifying instruction was given? Many things. First of all, I disagree. There was no marriage in argument of the facts to the law. Specifically, that's missing is discussion on the naturalization of the father, meaning there was no discussion as to the date upon which the father naturalized. This is key to the jury instructions in two ways. First of all, if the father is a naturalized citizen before the birth of Mr. Sandoval Gonzalez, that qualifies as a citizen, not just the later naturalization. Second. And so if Mr. Sandoval Gonzalez's father naturalized before the birth of the child, that qualifies him under the jury instructions. The other thing though, your whole defense was derivative citizenship, wasn't it? Yes. And we had nothing to argue against on the law. Well, you're arguing on the facts, aren't you? Aren't you saying the major premise, if a person's parents are American citizen, this person has citizenship through a concept known as derivative citizenship. Yes. That's your major premise. Major premise. But the instructions go further. And you argued that to the jury, did you not, on the basis of the facts presented to the jury? The problem with that is under the instructions, there's more that's required. There's the additional residency. For example, if both parents are United States citizens, there's still a requirement that one of them had to have been a resident of the United States prior to birth. You can review the closing arguments. There's no discussion of this residency requirement because that issue wasn't before the jury before then. Was there any evidence during the trial that that was the case? Absolutely, Your Honor. In the discussion of naturalization process, the AFILE custodian, I think it's Agent Lippley, testified to become a naturalized United States citizen. You have to have been a lawful permanent resident for several years. So there's absolute evidence in the record that supports that the father could have met residency requirements. If you have the evidence and the jury is later given the instruction on the law, where's the due process violation? The due process is, we were never allowed to explain that to the jury. Your Honor didn't, Your Honor, even reading the briefs, didn't get it. I could see the argument if you hadn't made reference to derivative citizenship in your closing argument. But I'm failing to make that last link that you're asking me to make, Your Honor. Well, the law, and I did submit a 28-J letter. Did Your Honors get it? I'm not sure I saw a 28-J letter. Okay, it was submitted on Tuesday, and I had the clerk's word that it was going to get to the bench. But review United States v. Gaskins. And they discuss what... What year was that case? I believe in the 80s, Gaskins. The 1980s case really is not an appropriate subject. Well, 1988, the cite is 849 F. Second, 454. It was decided before you filed your brief. It was decided before the brief, but it has the accurate law on prejudice. So it should have been in your brief, actually. Yes, but the issue was presented in the brief, and failure to cite a case, I don't think, This Court relying on the case that is now presented before the Court before argument. It's our option to read it once you've submitted it late, so... Well, I encourage the Court to, because you're concerned about prejudice, and it states... Let us assume that we're going to read it, and so you can argue it, saying that, Well, I was prevented from arguing to the jury. Now I'm prevented from arguing here. Thank you, Your Honor. Let the record show that we're going to consider it. Go right ahead. I'll do it in the next three minutes. I will. And it says, A party is prejudiced if unfairly prevented from arguing his or her defense to the jury, or was substantially misled in formulating or presenting arguments to the jury. And here, because we didn't have these instructions, we couldn't go through and explain to the jury the residency requirements. It's in no part, but under the instructions, it's mandatory for residency. There is a key marriage of the law to the facts. All defense counsel here had a chance to argue was, Use your common sense as to what derivative citizenship is. Closing argument means more than that. If the Court is saying, Well, if you get the right instructions and you've made some reference to something, Rule 30 means nothing. Because Rule 30 is, You should have the opportunity to know the law that you're going to argue, so you can marriage the law to the facts. And here, counsel simply did not have the opportunity to do that marriage. If you look at it, there is not one legal argument in that, in the entire closing argument. For example, this is what the law states. This is how the law applies to the facts. There are cases also in the 28J letter that says, Even during a bench trial, counsel should have the opportunity to make closing arguments. In a bench trial, the judge knows the law. He heard the facts. Well, so why is he prevented from making an argument? Because you need to have that marriage for closing argument to be meaningful. Otherwise, it's an opening statement. If you're just arguing facts from the trial, that's all you've done. Since I only have a minute and 50 seconds left, I'll reserve the rest for Roboto. Good morning, William Cole for the United States. In this case, Your Honor, the government, the court, excuse me, did in fact provide the instruction that was requested by counsel. There's no claim that the court left out any part of an instruction that counsel requested when the jury sent out the note. And so the question simply is whether or not they should have been allowed additional argument. But the district court got it right. When that issue arose, the district court went directly to the question, What more would you argue? And defense counsel essentially responded on page 652 of the excerpt of the record that we would argue that the government failed to prove, failed to disprove the derivative citizenship issue. It was a failure of proof argument, and district court said, You already argued that. You already argued that the government failed to prove his alienage. And so really what this case is about is should the defense have been able to, well, was there a constitutional violation that once the defense argued extensively that there was a failure of proof on the issue of derivative citizenship that once the jury was instructed with this additional instruction that the defense didn't get up to stand up again and argue once again that there was a failure of proof. But counsel, you would agree, would you not, that it is a much more powerful argument to a jury to be able to say, Now the judge is going to tell you that derivative citizenship may be established by the following three elements. And let's go through the evidence, ladies and gentlemen, element by element, and show why the government can't meet that in this case. And he didn't get a chance to do that because the instruction wasn't given until after argument. So instead all he's left with is just the bare argument. Well, Your Honor, it is correct that he didn't have a chance to argue specifically to the prongs of the statute. However, I would argue it's a marginal improvement to be able to go to the prongs of the statute and say, Where's the proof? I cannot ever recall hearing a prosecutor make a closing argument that did not involve an element by element examination of the evidence to convince the jury that he or she had met the burden of proof. Well, that may be true. So it's okay for you, but not okay for the defense? Is that it? No, Your Honor. I believe the question is, Did it rise to the level of requiring reversal? Was it that type of error? And I would submit that it was not. This jury obviously knew what the issue was. It asked for the instruction. It went back and spent 90 more minutes after that 7-1 instruction before it reached a verdict. It knew what the issue was. It had been hammered home to the jury that the issue was a failure of proof on the part of the government. And there really was This isn't a case where the defense was going to well, could not have come back and said, Let's look at the elements and I'll show you how the evidence establishes the elements of derivative citizenship. It had to say, Let's look at the elements and tell you again, like I've told you before, that there's no proof. And in addition, there also is a little bit of a problem at the outset because the defense was asking for four subparts of the statute. One of those subparts, the defense conceded, even though it was asking for it, subpart A of the statute on derivative citizenship, wasn't even applicable. The defense just wanted it for background. Now, in fairness to my co-counsel, who was at the trial, he indicates that his co-counsel, who wrote the brief, may have misread the record, may have misread their own record. But as the brief, as the petitioner's brief, or the appellant's brief states, he said that it's their position in the brief that if it's subpart C or nothing, we want nothing. And so the district court granted nothing. Now, that's the way I, reading the opening brief and the way I looked at the record, that's the way I understood it as well. There may be an error there that Mr. Brunkow wants to address. But if that's the case, then we also have a situation where the district court was offering to give an instruction on derivative citizenship, and it was turned down. And if that's the case, then I think it's even less likely that now there's error once the instruction was given in response to a juror question that no additional argument was given. I do want to address briefly the cases cited in the 28J letter, which I also received very recently, and starting with the Gaskin case, since that's the one cited by counsel. Gaskin's very different. In Gaskin, the court said it would not give an aiding and abetting theory that the prosecution wanted. It did not give the instruction. Counsel did not argue against the aiding and abetting theory. And then when a question came out from the jury, then the court gave an aiding and abetting theory. That's very different in this case, because in that case we have the prosecution arguing a theory of liability, but the defense counsel was not even told it was going to be presented. And when the theory has been presented, defense counsel has never had an opportunity to argue against it. And the court says that's not fair, it has to go back for a retrial. Here, nothing like that happened. The theory of defense was presented, it was argued, and it was simply clarified by the instruction. And in the Fontenot case cited by the government, the Fontenot case indicates that where you have a theory of defense instructed upon, a supplemental instruction that merely clarifies that theory does not mandate additional argument. And the government would submit that that is what's going on here. We had an instruction on theory of defense and a supplemental instruction that clarified that theory. And according to Fontenot, that does not necessarily mandate additional argument. Thank you, counsel. I'm about to give up my presiding duties to Judge Rawlinson or Judge Alderson to see if they can do a better job than I'm doing. Go ahead. I did reserve some time, though. Yes, you did. I'd like to make three quick points. First of all, the entire objection that was made in front of Judge Jones was as to what he would argue if allowed to. I think he'd go through the facts, laying out specifically how the government failed to disprove several elements that are now in the jury instructions. He did not have that ability yesterday, just as I have attempted to do here. There was additional elements, meaning the residency elements, that he didn't have an opportunity to go through with the jury. Secondly, as to whether or not this was that we potentially waived having the court instruct on one part of the instruction beforehand. I disagree with the statement in the opening brief that we told the court not to give C. If you read the specific transcript and it's at ‑‑ Did you say you disagree with the statement in the opening brief? Correct. I think it was a misreading of the record, and we did encourage the court to instruct on C. It specifically states that that's sort of record 602. Well, if it's the only option of having C or nothing, I think it should be C, there's a comma, because just C is misleading. I'm the one that said these words, and I believe I said, but C is just misleading, trying to preserve my objection that just giving one part with the other was misleading, but still trying to get C if I could get anything. The last part, as far as discussing the Fontenote case. In that case, it does say, if this is just defining a term, that's okay, but this is essentially the theory of defense. In Fontenote, it was an entrapment case. They gave us entrapment instruction, and later the jury had a question of what government agent meant, and that was okay not to allow additional argument as to this government agent. This is an entirely different situation. We asked for an instruction on derivative of citizenship. The government didn't give any instruction on derivative. I'll look on page 34 of the government's brief with five specific excerpts of defense counsel's close. It begins, what were contested, whether or not he's an alien, whether or not he obtained derivative citizenship for appearance, then went into specifically on the testimony. He went over facts, but he didn't have the ability to tie those facts to the law, and that's what closing argument is fundamentally about. I encourage the Court to look at the very end of the closing argument where defense counsel had to say, well, the judge has instructed you the theory of defense that he hasn't proven citizen. This is a statement. You have heard him say that a person can get derivative citizenship of being born to one parent who is a United States citizen. That was your whole legal defense. But you have to go through the legal requirements, and that involves residency, and that's never argued to the jury. And at the end, defense counsel has said, well, the judge hasn't instructed you as to what citizenship, so use your common sense. How can you ask a jury to use their common sense? If we had this instruction, there would have been a more powerful closing argument. I think we understand. Thank you. Counsel, thank you. The case just argued is submitted.
judges: Aldisert, Tallman, Rawlinson